UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TIMOTHY T. MERRICK,

       Plaintiff,

v.                              CASE NO. 8:19-cv-1495-MCR

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

       Defendant.

_____/

## MEMORANDUM OPINION AND ORDER[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an

administrative decision regarding the issue of overpayment of disability

insurance benefits ("DIB"). Following an administrative hearing held on

March 8, 2018, the assigned Administrative Law Judge ("ALJ") issued a

decision on June 20, 2018, finding that Plaintiff was overpaid DIB in the

amount of $65,720.50 for the period of November 30, 2011 through August

31, 2015, and that Plaintiff was at fault for causing the overpayment. (Tr.

15-18, 331-63.) Plaintiff has exhausted his available administrative remedies

and the case is properly before the Court. Based on a review of the record,

the briefs, and the applicable law, the Commissioner's decision is

_____

[1] The parties consented to the exercise of jurisdiction by a United States
Magistrate Judge. (Doc. 24.)

**AFFIRMED.**

## I.   Standard of Review

The scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (per curiam). Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991) (per curiam). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (per curiam); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

## II.   Discussion

### A.   Issues on Appeal

Plaintiff raises two arguments on appeal: (1) that the ALJ erred in finding that Plaintiff was overpaid DIB in the amount of $65,720.50 for the period of November 30, 2011 through August 31, 2015; and (2) that the ALJ erred in finding that Plaintiff was at fault for causing the alleged overpayment.  (Doc. 29.)

Defendant responds that substantial evidence supports the ALJ's finding that Plaintiff was overpaid DIB in the amount of $65,720.50 for the period of November 30, 2011 to August 31, 2015, because his disability and entitlement to DIB ended in November of 2011 when his monthly earnings reached $1,040.39.  (Doc. 32 at 1-2.)  Defendant explains that the amount of Plaintiff's earnings after his entitlement to DIB ended is irrelevant.  (*Id.* at 9 ("Even if Plaintiff had no earnings after November 2011, that would not change the fact that he was no longer entitled to DIB.").)  Defendant also points out that "Plaintiff's argument that his earnings from 2011 through 2015 were below SGA [i.e., substantial gainful activity] levels incorrectly relies on the monthly average of his yearly earnings given his work history." (*Id.* (citing 20 C.F.R. §§ 404.1592a(a)(3)(i),  404.1574a(d)).)

Regarding the second issue on appeal, Defendant responds that substantial evidence supports the ALJ's finding that Plaintiff was at fault for

3

causing the overpayment and was, therefore, not entitled to a waiver of

recovery for the overpayment.  (*Id.* at 1.)  Defendant explains:

> The record provides ample evidence that Plaintiff knew that he
> should have reported his earnings to [the] SSA [i.e., the Social
> Security Administration] and that he accepted DIB payments
> that he knew, or could have been expected to know, were
> incorrect.  Several SSA communications between February and
> October [of] 2011 informed Plaintiff of an earlier overpayment he
> received for failing to report the substantial work he performed
> starting in 2008.  These communications informed Plaintiff that
> his work activity did and could continue to affect his entitlement
> to DIB.  Despite these notices, Plaintiff failed to inform [the] SSA
> of his substantial work activity in November [of] 2011.
> Furthermore, despite his substantial earnings in November [of]
> 2011[,] Plaintiff continued to accept DIB from November [of] 2011
> through August [of] 2015 that he knew or could be expected to
> know were incorrect.

(*Id.* at 1-2.)

## B.    Administrative Proceedings and Relevant Record Evidence

Plaintiff was found disabled as of July 22, 2000 and entitled to DIB

starting March of 2001.  (*See, e.g.*, Tr. 15, 17, 19-21.)  On May 10, 2010, the

SSA conducted a continuing disability review and determined that Plaintiff's

entitlement to DIB ended in June of 2008, which was the first month of SGA

after his trial work period ("TWP").[2]  (Tr. 19-20.)  Plaintiff's extended period

---

[2] The TWP allows a claimant receiving DIB to test his ability to work while receiving benefits.  *See* 42 U.S.C. § 422(c)(2); 20 C.F.R. § 404.1592(a).  Generally, the TWP spans the first nine months that the claimant engages in work even if the work is not SGA and the months are not consecutive.  *See* 42 U.S.C. § 422(c)(4); 20 C.F.R. § 404.1592(a)-(b).  A claimant may work receiving SGA levels of earnings during the TWP and still receive DIB.  *See* 20 C.F.R. § 404.316(d) ("Earnings during

of eligibility ("EPE")[3] began in June of 2008.  (Tr. 20.)  The SSA determined that, as of July 2, 2010, Plaintiff had an overpayment balance in the amount of $16,638.00.  (Tr. 25.)

On February 3, 2011, the SSA issued a revised determination that Plaintiff was no longer entitled to DIB as of September of 2008.  (Tr. 27-29, 31.)  The letter explained that Plaintiff's TWP ended in May of 2008, but because the SSA pays "benefits for the month disability ends and the following 2 months no matter how much is earned," Plaintiff would be paid benefits through August of 2008.  (Tr. 31.)  The letter advised that Plaintiff's EPE began in June of 2008; the EPE would last thirty-six months until June of 2011; during the EPE, the SSA would restart payments for any month(s)

---

your trial work period do not affect the payment of your benefit.").  Here, Plaintiff's nine-month TWP was from September of 2007 through May of 2008 and during this period, Plaintiff's payments continued.  (Tr. 20-21, 28-29, 31.)

[3] Also described as the re-entitlement period, the EPE is an additional thirty-six month period during which a claimant receiving DIB payments may continue to test his ability to work.  *See generally* 20 C.F.R. § 404.1592a.  If a claimant performs SGA levels of work during this period, the SSA will determine that the claimant's disability ceased and stop paying DIB after a three-month grace period.  *See* 20 C.F.R. § 404.1592a(a)(1)-(2)(i).  However, a claimant can still receive DIB for each remaining month during the EPE when he does not work at SGA levels.  *See* 20 C.F.R. § 404.1592a(a)(2)(i).  Additionally, if the SSA determines a claimant's disability has ceased during the EPE because the claimant performed SGA levels of work, the claimant's entitlement to DIB will terminate in the first month in which the claimant performs SGA after the end of the EPE.  *See* 20 C.F.R. § 404.1592a(a)(3)(i).  In determining whether substantial work has been performed after the end of the EPE, the SSA considers only the earnings for a given month, rather than averaging earnings over a period of months.  *See id.*; 20 C.F.R. § 404.1574a(d).

that Plaintiff's work was not substantial if his health problems still met the SSA's rules; and the SSA would usually find that "work is substantial if gross monthly earnings average more than . . . $1,000" for the year 2011.  (Tr. 27-28, 31-32.)  The letter also advised that Plaintiff had performed substantial work during his EPE starting in September of 2008.  (Tr. 31.)

In April of 2011, the SSA held a personal conference with Plaintiff and found that he was still working but below SGA levels.  (Tr. 261, 283.)  On April 7, 2011, the SSA issued a decision, denying Plaintiff's request for a waiver of the overpayment that he had received from September of 2008 through December of 2009, during his EPE.  (Tr. 39-45.)  The SSA found that Plaintiff was at fault for causing the overpayment due to lack of evidence in his favor and that he had the ability to repay the balance owed (the total amount was $17,794.50 with a remaining balance of $8,932.20).  (Tr. 40, 43-44 ("You were found at fault for causing the overpayment because we do not show that you reported your return to work in a timely manner.  You have agreed to repay the overpayment at $250.00 per month from your disability benefits.").)

On July 20, 2011, the SSA issued a revised decision that Plaintiff's disability had ended and that he was not entitled to DIB from September of 2008 through August of 2010.  (Tr. 46.)  This notice reiterated that Plaintiff's TWP ended in May of 2008, that his EPE began in June of 2008 and ended in

June of 2011, that gross monthly earnings averaging more than $1,000 in 2011 would generally be considered substantial work, and explained the effects of performing substantial work during and after the end of the EPE. (Tr. 46-47.)

In September of 2011, Plaintiff contacted the SSA to request another waiver, and in October of 2011, he provided his paystubs and bills for the preceding three months.  (Tr. 56-57, 59, 283.)  On November 9, 2011, the SSA issued a letter to Plaintiff that his entitlement to DIB began in March of 2001; his receipt of benefits for September of 2008 through August of 2009 resulted in an overpayment of $17,928.10; his benefits were reinstated beginning in September of 2010; and he had already received benefits for September of 2010 through March of 2011.  (Tr. 60-62.)

On January 3, 2012, the SSA sent out another letter to Plaintiff, stating, in relevant part:

> We recently reviewed the evidence in your Social Security disability claim and found that your benefits should continue.  . . .

> Your claim will be reviewed from time to time to see if you are still eligible for benefits based on disability.  . . .

> **Promptly Report Events Which May Affect Your Benefits**

> You must promptly report any changes which may affect your benefits.  Failure to do so could mean you may have to repay any benefits not due.  Let us know if:

> • You returned to work since your last report or you return to

work in the future (no matter how little you earn); or

- You previously reported your work, but the duties or pay have changed.  (Remember to keep records of your work and earnings such as pay statements from your employer.) . . . .

**Explanation Of The Trial Work Period**

. . .
If you are an employee, we only count months you:
- earn over $720.00 a month beginning in January 2012
- earn over $720.00 a month beginning in January 2011
. . .

**After Your Trial Work Period**

After we count your 9 trial work months, your right to monthly payments will still continue if you are disabled and your average earnings are not over:
- $1,010.00 a month beginning in January 2012.
- $1,000.00 a month beginning in January 2011.

If your average earnings are more than these amounts, we call your work "substantial" and we will stop your monthly payments. . . .

**Extended Period of Eligibility**

If we must stop your monthly payments after 9 months of trial work, we may still be able to help you.  For 36 months after your trial work period ends, we can pay you for any month that you are disabled and your work is not substantial.  To get these benefits, you do not have to apply again.  Just let us know how much you are earning.

(Tr. 74-77.)

On January 10, 2012, the SSA sent another letter to Plaintiff,

explaining that, based on the existing facts, the SSA could not approve his

8

request for a waiver of the overpayment of $17,928.10, but Plaintiff had a right to schedule a personal conference before a decision was made and had a right to review his file before the personal conference. (Tr. 79.) The letter further explained that Plaintiff's file review was set for January 19, 2012 and his personal conference was set for January 26, 2012. (*Id.*) However, Plaintiff failed to appear for his personal conference. (Tr. 284.)

On February 29, 2012, the SSA issued a letter, denying Plaintiff's request for a waiver of the overpayment of $17,928.10 for the period September of 2008 to December of 2009. (Tr. 81, 84-85.) The SSA determined that Plaintiff was at fault for causing the overpayment because he earned over SGA limits while collecting DIB during the period at issue. (Tr. 81-82, 85 (stating that Plaintiff "did not exercise a high degree of care by reporting his wages while collecting disability benefits" and that "recovery [was] not against equity and good conscience"; also stating that "[o]nce an individual is advised of the correct interpretation of a provision, he will be found at fault for any subsequent overpayments involving the same provision").)

On September 24, 2014, Plaintiff completed a Work Activity Report for the SSA and enclosed pay stubs or gross wage print-outs for his work as a "kid supervisor" (after school care) for Tampa Palms Club, Inc., which started in September of 2011. (Tr. 91.) In the Work Activity Report, Plaintiff wrote:

9

> Right now[,] I struggle to repay the "supposed" overpayment.
> With the paying job I presently have[,] along with my benefit, I
> barely make it[,] paying bills and buying essentials to survive.
> To this day, I strongly disagree with the overpayment.  I reported
> everything in the past as directed by [the] SSA and still got
> penalized.  Regardless of reporting taxes.

(Tr. 95.)  The attached pay stubs reflect that Plaintiff was paid the following

gross amounts of earnings: $417.42 for July 31, 2013–August 13, 2013;

$199.53 for August 14, 2013–August 27, 2013; $448.02 for August 28, 2013–

September 10, 2013; $490.68 for September 11, 2013–September 24, 2013;

$509.76 for September 25, 2013–October 8, 2013; $480.51 for October 9,

2013–October 22, 2013; $511.56 for October 23, 2013–November 5, 2013;

$479.43 for November 6, 2013–November 19, 2013; $642.48 (including

Christmas bonus of $276.45) for November 20, 2013–December 3, 2013;

$470.25 for December 4, 2013–December 17, 2013; $140.49 for December 18,

2013–December 31, 2013; $225.72 for January 1, 2014–January 14, 2014;

$466.74 for January 15, 2014–January 28, 2014; $483.39 for January 29,

2014–February 11, 2014; $426.60 for February 12, 2014–February 25, 2014;

$371.61 for March 12, 2014–March 25, 2014; $500.76 for March 26, 2014–

April 8, 2014; $434.79 for April 9, 2014–April 22, 2014; $433.26 for April 23,

2014–May 6, 2014; $432.72 for May 7, 2014–May 20, 2014; $475.20 for May

21, 2014–June 3, 2014; $448.83 for June 4, 2014–June 17, 2014; $485.10 for

June 18, 2014–July 1, 2014; $309.42 for July 2, 2014–July 15, 2014; $491.49

for July 16, 2014–July 29, 2014; $243.90 for July 30, 2014–August 12, 2014;

$287.37 for August 13, 2014–August 26, 2014; and $425.70 for August 27,

2014–September 9, 2014.  (Tr. 97-124.)

On March 30, 2015, the SSA sent a letter to Plaintiff's employer,

Clubcorp Finance Management, requesting information about the amount of

gross wages that Plaintiff earned in the years 2010, 2011, and 2012.  (Tr. 88-

89.)  On April 21, 2015, Clubcorp Finance Management responded, in

relevant part, that Plaintiff earned $1,040.39 in November and $717.91 in

December of 2011, and he earned the following amounts in 2012: $848.87 in

January, $800.59 in February, $901.26 in March, $935.60 in April, $962.10 in

May, $960.30 in June, $891.72 in July, $826.47 in August, $918.00 in

September, $969.75 in October, $995.85 in November, and $985.74 in

December.  (Tr. 89.)

On August 30, 2015, after a continuing disability review, the SSA

issued a notice informing Plaintiff that his disability had ended; he was not

entitled to DIB for September of 2008 through August of 2010, October of

2010, November 30, 2011 and continuing; Plaintiff's TWP had ended in May

of 2008; his thirty-six month EPE had started in June of 2008 and had ended

in June of 2011; and Plaintiff had performed SGA after the TWP. (Tr. 127-

29, 132, 261 (also stating that multiple letters were sent to Plaintiff along

with multiple work reviews); *see also* Tr. 157 (showing that Plaintiff's gross

monthly earnings for November of 2011 were $1,040.39), 230-31 (showing above-SGA-level earnings for September of 2008–August of 2010, October of 2010, November 30, 2011 and continuing).)  The notice reiterated the amounts of gross monthly earnings that the SSA usually considered to be substantial work and these amounts were: $1,000 in 2011; $1,010 in 2012; $1,040 in 2013; $1,070 in 2014; and $1,090 in 2015.  (Tr. 130.)

On September 2, 2015, the SSA notified Plaintiff that he was overpaid $65,720.50 in DIB from November of 2011 through August of 2015.  (Tr. 143.) The letter also stated: "If we do not receive your refund within 30 days, we will hold back your full benefit starting with the payment you would normally receive about November 3, 2015.  We will continue holding back your benefits until we recover the overpayment."  (Tr. 143.)

On September 21, 2015, Plaintiff requested reconsideration of the determination.  (Tr. 15, 145.)  He stated: "I'm not at fault; I need all income including SSA benefit."  (Tr. 145.)  On September 28, 2015, Plaintiff requested a waiver of the overpayment recovery.  (Tr. 147-54.)  He reiterated that the overpayment was not his fault and he could not afford to pay the money back and/or it was unfair for some other reason.  (Tr. 147, 149.) Plaintiff explained: "I scheduled meetings with [the] SSA to correct [the] problem; [and to] prevent any in [the] future after mail notifications in 2011." (Tr. 148.)  Plaintiff responded affirmatively to the question whether he had

12

informed the SSA about the change or event that had caused the overpayment and explained that he had set up in-person appointments at the Carrollwood Office on June 23, 2011 and July 14, 2011. (*Id*.) Plaintiff acknowledged that he had been overpaid before. (*Id*.) He further acknowledged that he was employed and was being paid gross monthly wages of $950. (Tr. 151.)

On November 20, 2015, the SSA notified Plaintiff that in connection with his request for a waiver, he needed to submit proof of income, assets, and expenses no later than December 20, 2015. (Tr. 161.) Plaintiff's bank statements, phone bill, insurance bill, rent, and other expenses were received by the SSA on December 24, 2015. (Tr. 161-203.) Plaintiff's paystubs for 2015 show the following gross earnings: $438.66 for August 26, 2015–September 8, 2015; $495.90 for September 9, 2015–September 22, 2015; $518.99 for September 23, 2015–October 6, 2015; $511.39 for October 7, 2015–October 20, 2015; $538.75 for October 21, 2015–November 3, 2015; and $523.07 for November 4, 2015–November 17, 2015. (Tr. 208.) The SSA records show Plaintiff's earning were: $9,874.84 in 2011; $11,022.44 in 2012; $11,301.72 in 2013; $10,883.54 in 2014; and $12,086.47 in 2015. (Tr. 214, 276.)

On May 6, 2016, the SSA sent a letter to Plaintiff that his personal conference had been set for the afternoon of May 16, 2016 and that he could

review his file prior to the conference.  (Tr. 225.)  At the May 16, 2016

personal conference, Plaintiff requested a waiver "based on the fact that he

handed in pay stubs regularly and [was] not at fault."  (Tr. 242.)

On May 18, 2016, the SSA denied Plaintiff's request for a waiver of

recovery of the overpayment of $65,720.50.  (*Id.*)  The SSA determined that

Plaintiff was at fault because he caused the overpayments working over the

SGA limits while collecting DIB.  (Tr. 243-44.)  The notice explained:

> Number holder [i.e., Plaintiff] has had multiple over[-
> ]payments due to SGA and he had a repayment agreement . . . of
> $250.00 previously.
> His attorney states he handed in pay stubs regularly in
> good faith.  I do not show he handed them in regularly and no
> proof was provided.  We do not show regular pay stubs being
> submitted, but we show SSA had made requests for wages to the
> employer.
> Mr. Merrick has had multiple reviews 2010-2012 and
> should know his responsibilities and the process based on
> previous over payments.  He continued to work over SGA and did
> not return monies based on his earning[s].
> . . .
> Based on the waiver[,] the number holders [sic] expense[s]
> exceed his income by $573.00, he provided proofs of the expenses.
> Recovery would cause a hardship.  Number holder has filed an
> EXR, if approved this will change his economic situation.
>
> Mr. Merrick is at fault for causing the multiple over[-
> ]payments due to SGA.  He knows or should have known to
> return the monies.  Mr. Merrick does not meet both criteria[] for
> the waiver.  Therefore[,] denying the above[,] [we] find Mr.
> Merrick at fault.

(Tr. 243.)  The Non-Disability Appeal Report form confirmed that Plaintiff

had previously had five work reviews – on January 14, 2009, January 19,

2011, May 10, 2011, January 3, 2012, and August 30, 2014; he had been

overpaid before; and he was "aware of SGA limits and reporting

responsibilities." (Tr. 246.)

Based on Plaintiff's request, an administrative hearing took place on

March 8, 2018. (Tr. 227, 331-63.) At the hearing, Plaintiff's attorney

presented a letter, dated June 28, 2011, provided by Plaintiff on the day of

the hearing and prepared by his employer, which purportedly had been

furnished to the SSA as proof of income during one of the personal

conferences. (Tr. 346, 349.) The letter does not seem to be a part of the

record. Plaintiff's counsel stated that after this letter, there had been no

other documentation from Plaintiff's employer. (Tr. 346.)

At the hearing, the following exchange took place between Plaintiff and

his attorney:

> Q      In between 2011 and 2015, did you have any contact with
> [the] Social Security [Administration] as far as giving them
> paycheck stubs, them asking you for information, that sort of
> thing?
> A      I don't remember, but if they asked for it, then I definitely
> sent it because like I said, I didn't want any problems with
> anything happening over again.
> . . .
> Q      . . . [T]his letter dated June 28th, 2011, indicates that in
> May and June of 2011 – pretty much most of 2011, you were
> making anywhere from – in the neighborhood of $800 a month.
> A      Yes.
> Q      It went up and down a tiny bit, but is that about right?
> A      Yes.
> Q      Okay. So and currently – so during that period of time

from 2011 to 2015, . . . did your income change from this?  Did it
go way up or way down or –

A No, it pretty much stayed the same.

. . .

Q . . . [W]as there ever a time that Social Security got in
touch with you and said they needed information from you and
you didn't give it to them?

A If they asked for information, then I would have given it to
them.  Like I don't know specifically if there was a time . . .
during that period, but if I got a letter saying anything, then I
would definitely respond.

. . .

Q And after you gave them this income information from
Tampa Palms, after they reinstated you, did you think that they
then had everything they needed to determine whether or not
they should keep sending you checks?

A Yes.

. . .

Q . . . But specifically after you were employed and you
started working, how did you communicate first to [the] Social
Security [Administration] that you were working and what your
rate of pay was?

A I believe it was by mail.

. . .

Q When did you start working part[-]time?

A In August of 2011.

. . .

Q And did you communicate the change in your employment
nature to the [SSA]?

A Yes, ma'am.

Q When did you communicate that and how?

A When . . . I found out that I wasn't getting benefits any
more, I went to the office and that's when I reapplied.

. . .

Q . . . As it relates to waiver, I note that there is a formal
request for waiver contained in the file.  On that you said you
currently are still working, correct?

A Yes, ma'am.

Q And what is your approximate rate of pay either weekly or
monthly?

A I make $10 an hour and I get about $500 to 550 every two

weeks.

(Tr. 350-56, 358.)

Plaintiff testified that he could not refund the overpayment because he was living from "paycheck to paycheck" and needed the money to pay for groceries (about $300 per month), car insurance ($100 per month), gas (about $200 per month), cellphone bill ($85 per month), credit card payments ($50-$100 per month minimum payment), storage unit fee ($160 per month), and medical/dental expenses due to lack of medical/dental insurance. (Tr. 352-53, 359-60.) Plaintiff also testified that he should not pay anything back because he "did nothing wrong." (Tr. 361-62.)

On June 20, 2018, the ALJ issued her decision with the following pertinent findings: Plaintiff was overpaid DIB in the amount of $65,720.50 for the period November 30, 2011 through August 31, 2015; Plaintiff was at fault in causing the overpayment due to working at/over SGA levels while collecting DIB; Plaintiff had multiple reviews and should know/should have known his responsibilities and the process based on previous overpayments; Plaintiff did not return the overpayments; and Plaintiff did not qualify for a waiver of the overpayment. (Tr. 15-17.)

With respect to her finding that Plaintiff was overpaid DIB in the amount of $65,720.50, the ALJ explained:

The claimant was found disabled as of July 22, 2000.

Subsequently in 2011 and 2012, the claimant was found to have been overpaid $17,194.50 <u>due to his failure to report work activity</u> performed in 2008 and 2009. After his waiver request was denied, he agreed to and began repaying his overpayment (Exhibit 9). However, although the claimant continued to work during this period, he was no longer working at [SGA] levels and this led to his extended period of eligibility ("EPE"), reinstating his disability benefits.

Then, in a 2015 review, it was determined that the claimant's continued work activity necessitated a benefits termination as of November 2011, and that he was overpaid $65,720.50 for benefits paid from November 2011 until August 2015 (Exhibit 29). The claimant filed a waiver of overpayment again and submitted documentation regarding his expenses and income. It was determined that based on multiple work reviews and letter he had been sent, the claimant should have known to watch his earnings and report that he had earned over SGA. As such, he was found at-fault for creating the overpayment and it was not waived <u>due to his failure to report work activity</u>.

The claimant and his representative argued at the May 2016 personal conference that he was not at fault, and that he regularly submitted his paystubs to the [SSA], but he continued to receive the benefits anyway (Exhibit 35). The claimant did not dispute receiving the monies. The claimant's allegations are not given controlling weight because there is insufficient evidence to support his assertion that he provided paystubs to the SSA on a regular basis. At the hearing, the claimant was not able to recall if he gave any information or had any contact with the SSA from 2011 to 2015. He did testify that he earned more money before 2011, when his job transitioned from full-time to seasonal, and then he was subsequently transferred to a part-time position. He believes that he responded to the SSA and provided pay information via mail during this period (Hearing Testimony).

(Tr. 17 (emphasis in original).)

Further, with respect to her finding that Plaintiff was at fault, the ALJ stated:

The claimant alleges that he is not at fault because he submitted documentation to the SSA regarding his earnings.  Prior to the hearing, and during testimony, the claimant was unable to furnish material information.  Additionally, the claimant has experience with overpayment procedures and should have known to notify [the] SSA of the overpayments, of his earnings, and of any material change in his circumstances.  There is no controlling evidence that he did so.  The claimant's testimony included his *belief* that he informed [the] SSA of his earnings, but he was unsure if he called or mailed information to the SSA, or even general or broad dates of his alleged correspondence.

The record shows that the claimant's disability payments were ceased in June [of] 2008 as a result of SGA, after a trial work period (Exhibit 1).  The claimant's SGA continued[,] and he was found at fault, liable for $17,794.50 in repayments (Exhibit 8).  The claimant was or should have been aware that he is liable for overpayments if individually at fault for the overpayment.

The claimant's testimony and evidence regarding his expenses (*see* Exhibits 33 through 39) are not material to this decision due to the claimant's fault in the overpayments, after considering all pertinent circumstances, including the claimant's age, intelligence[,] and limitations.  The facts show that the overpayments to the claimant were accepted when the claimant knew or could have been expected to know the payments were incorrect.  The claimant's previous experiences with the overpayment and fault process, as evidenced specifically in Exhibits 3 and 8, are controlling evidence that the claimant knew or could have been expected to know that the payments were incorrect, not his monthly expenses.  As such, the claimant is liable for the overpayment and there is no need to determine whether recovery of the overpayment is against equity and good conscience under Title II of the [Social Security] Act.

(Tr. 17-18 (emphasis in original).)  As such, the ALJ found that recovery of

the overpayment was not waived, and Plaintiff was liable for repayment of

DIB in the amount of $65,720.50 for the period November 30, 2011 through

August 31, 2015.  (Tr. 18.)

Plaintiff appealed the ALJ's decision to the Appeals Council.  In his initial memorandum, dated July 17, 2018, Plaintiff argued that there was no overpayment because the SGA was not exceeded during the period in question because:

    a.  2012 earnings are $11,022.44.  [The] SGA for that year was $1,010.00.  Claimant is BELOW SGA as his monthly earnings were $918.53.

    b.  2013 earnings were $11,301.72.  [The] SGA for that year was $1,040.00.  Claimant is BELOW SGA as his monthly earnings were $941.81.

    c.  2014 earnings were $10,883.54.  [The] SGA for that year was $1,070.00.  Claimant is below SGA as his monthly earnings were $906.96.

    d.  2015 earnings were $12,086.47.  [The] SGA for that year was $1,090.00.  Claimant is below SGA as his monthly earnings were $1,007.20.

(Tr. 324-25.)

In his supplemental memorandum, dated February 26, 2019, Plaintiff addressed the "fault" issue, as follows:

As pointed out previously, the claimant advised the administration, in writing, on his July 20, 2011 application for SSI, on pages 3 and 4, that he expected that his income of 2011 and 2012 would be CONTINUING.  The administration, despite clearly having been notified that the income would not be stopping or ending, . . . CONTINUED to pay him.

At the hearing[,] the claimant testified that it was his belief that he either called the information in or mailed the earnings information in.

. . .

It is clear that Mr. Merrick informed the administration that he was working and where he was working in light of the fact that the administration actually requested wage information from his employer.

Clearly, Mr. Merrick was not at fault for an alleged overpayment (which is disputed) as he had provided the administration with his work information and yet they still paid him every month.

(Tr. 327-28.)

On April 16, 2019, the Appeals Council denied Plaintiff's request for review.  (Tr. 5-9.)  The Appeals Council found that Plaintiff's evidence (W-2's from 2012 through 2015, a letter from Tampa Palms Golf and Country Club dated June 28, 2011, and an application for Supplemental Security Income dated July 20, 2011) did not show a reasonable probability that it would change the outcome of the decision.  (Tr. 6.)

## C.    Relevant Law

If the Commissioner of Social Security finds that more than the correct amount of payment has been made to any person, the Commissioner may seek a refund of the excess amount or reduce future payments to recapture the amount of overpayment.  *See* 42 U.S.C. § 404(a)(1); 20 C.F.R. § 404.501(a).  However, adjustment or recovery of the overpayment shall be waived if the person is without fault *and* adjustment or recovery would either defeat the purpose of Title II of the Social Security Act or would be against

21

equity and good conscience.  42 U.S.C. § 404(b)(1); 20 C.F.R. § 404.506(a).  It is the individual's responsibility to provide information, along with supporting documentation, to the SSA to support his contention that he is without fault and that adjustment or recovery would either defeat the purpose of Title II or would be against equity and good conscience.  20 C.F.R. § 404.506(d).

Fault, as used in "without fault" in 20 C.F.R. § 404.506, applies only to the individual.  20 C.F.R. § 404.507.  "Although the [SSA] may have been at fault in making the overpayment, that fact does not relieve the overpaid individual . . . from liability for repayment if such individual is not without fault."  20 C.F.R. § 404.507; *see also Martinez v. Astrue*, No. 10-80723-CIV, 2011 WL 679851, *3 (S.D. Fla. Feb. 1, 2011) ("If the claimant accepted a payment which he knew or should have known was incorrect, then he may be considered at fault, even if [the] SSA should not have made the payment in the first place.").

In determining whether the individual is at fault, the SSA considers all pertinent circumstances, including the individual's age and intelligence, and any physical, mental, educational, or linguistic limitations he may have.  20 C.F.R. § 404.507; *see also* 42 U.S.C. § 404(b)(2); *Martinez*, 2011 WL 679851 at *3 (citing *Jefferson v. Bowen*, 794 F.2d 631, 633 (11th Cir. 1986)) ("Assessing the Plaintiff's fault requires a subjective consideration of his circumstances

and the reasonableness of his actions.").  What constitutes fault on the part of the overpaid individual depends on whether the facts show that the incorrect payment resulted from: (a) an incorrect statement made by the individual which he knew or should have known to be incorrect; (b) failure to furnish information which he knew or should have known to be material; or (c) acceptance of a payment which the overpaid individual either knew or could have been expected to know was incorrect.  20 C.F.R. § 404.507.   Claimants "are expected to prevent overpayments."  *Martinez*, 2011 WL 679851 at *3. "[C]laimants who either demonstrate a lack of good faith or fail to exercise a high degree of care in reporting circumstances that may affect benefit entitlement will be found at fault."  *Id.*; *cf. Doan v. Sec'y of Health & Human Servs.*, 822 F.2d 59, *1 (6th Cir. 1987) (per curiam) (stating that "the finding of 'fault' in the context of an overpayment case does not imply a finding of bad faith or improper motive, but can be the result of an honest mistake") (citation omitted).

If the claimant is considered to be without fault, the ALJ must decide whether recovery of the overpayment would defeat the purpose of Title II of the Social Security Act.  *See* 42 U.S.C. § 404(b)(1); 20 C.F.R. § 404.506(a). Adjustment or recovery will defeat the purpose of the Social Security Act where the claimant "needs substantially all of his current income (including [S]ocial [S]ecurity monthly benefits) to meet current ordinary and necessary

living expenses." 20 C.F.R. § 404.508(b).  Ordinary and necessary expenses

include: (1) fixed living expenses, such as food and clothing, rent, mortgage

payments, utilities, maintenance, insurance (*e.g.*, life, accident, and health

insurance including premiums for supplementary medical insurance

benefits), taxes, installment payments, etc.; (2) medical, hospitalization, and

other similar expenses; (3) expenses for the support of others for whom the

claimant is legally responsible; and (4) other miscellaneous expenses which

may reasonably be considered as part of the claimant's standard of living.  20

C.F.R. § 404.508(a).

    If the claimant is found to be without fault, the ALJ must also consider

whether recovery of the overpayment is against equity and good conscience

under Title II of the Social Security Act.  20 C.F.R. § 404.506(b)(3).  The

phrase "'against equity and good conscience' is not limited to the meaning

used in [20 C.F.R.] § 404.509 but means a broad concept of fairness that takes

into account all of the facts and circumstances of the case."  20 C.F.R. §

404.506(b)(3).  Recovery of an overpayment is against equity and good

conscience (under Title II and Title XVIII) if the individual: (1) changed his

position for the worse or relinquished a valuable right because of reliance

upon a notice that a payment would be made or because of the overpayment

itself; or (2) was living in a separate household from the overpaid person at

the time of the overpayment and did not receive the overpayment.  20 C.F.R.

§ 404.509(a).  "The individual's financial circumstances are not material to a finding of against equity and good conscience."  20 C.F.R. § 404.509(b).

### D.  Analysis

The Court finds that substantial evidence supports the ALJ's finding that Plaintiff was overpaid $65,720.50 in DIB for the period November 30, 2011 through August 31, 2015.  As the record shows, Plaintiff's TWP ended in May of 2008; his EPE began in June of 2008; he performed SGA-level work during his EPE starting in September of 2008, which ended his disability; his EPE ended in June of 2011; and he performed SGA-level work in November of 2011 when he earned $1,040.39.  Because Plaintiff continued to receive DIB from November of 2011 to August of 2015 to which he was not entitled, the ALJ properly found that Plaintiff received an overpayment for that period in the amount of $65,720.50.

To the extent Plaintiff argues that there was no overpayment because his *average* earnings over a period of months were below SGA levels, averaging his monthly earnings was not appropriate here because Plaintiff performed SGA-level work both during and after his EPE.  *See* 20 C.F.R. § 404.1574a(d) ("We will not average your earnings in determining whether benefits should be paid for any month(s) during or after the re[-]entitlement period that occurs after the month disability has been determined to have ceased because of the performance of substantial gainful activity."); 20 C.F.R.

§ 404.1592a(a)(3)(i) (stating that in making a determination that a claimant's entitlement to DIB terminates in the first month in which he engaged in SGA after the end of the EPE, if the claimant worked during the EPE and it was decided that his disability ceased during the EPE because of work under 20 C.F.R. § 404.1592a(a)(1), the SSA will consider only the claimant's "work in, or earnings for, that month; [and] will not apply the provisions of . . . [20 C.F.R.] § 404.1574a regarding averaging of earnings").

Here, based on a review of Plaintiff's actual earnings each month following the end of the EPE, the SSA properly determined that Plaintiff's entitlement to DIB terminated in November of 2011, the first month after his EPE ended in which he performed SGA-level work. As Plaintiff's entitlement to DIB ended in November of 2011, his subsequent monthly earnings are irrelevant to the issue of overpayment. Therefore, substantial evidence supports the ALJ's finding that Plaintiff was overpaid DIB in the amount of $65,720.50 for the period November 30, 2011 through August 31, 2015.

In addition, substantial evidence supports the ALJ's finding that Plaintiff was at fault for causing the overpayment and, as such, he was not entitled to a waiver. As Defendant points out, "Plaintiff does not allege that he had any impediment to understanding his reporting obligations or that he did not understand that his work could affect his entitlement to DIB." (Doc. 32 at 13.) To the contrary, Plaintiff testified at the hearing that he made

26

sure he complied with any requests for information from the SSA because he "didn't want any problems with anything happening over again." (Tr. 350.) Yet, Plaintiff accepted payment that he knew or could have been expected to know was incorrect and/or failed to furnish, fully and/or regularly, information that he knew or should have known to be material. *See* 20 C.F.R. § 404.507(b), (c). As Plaintiff reportedly did not remember if he had any contact with the SSA between 2011 and 2015, it can hardly be argued that he exercised a high degree of care in reporting circumstances that could affect his entitlement to DIB.

Also, substantial evidence supports the ALJ's statement that Plaintiff had multiple reviews pertaining to the previous overpayment and Plaintiff should have known his responsibilities and the process. Specifically, prior to November of 2011, Plaintiff received an overpayment for his failure to report earnings in 2008 and 2009. In 2011, Plaintiff received notices from the SSA advising of the starting and ending dates of his EPE, the effect of SGA-level work on his eligibility for DIB, and the amount of monthly earnings that constituted SGA-level work in 2011. (*See* Tr. 31-32, 46-47, 60-61.) However, as the ALJ noted, there is no controlling evidence that Plaintiff provided pertinent information to the SSA on a regular basis. Although the record indicates that Plaintiff contacted the SSA in 2011, this was in connection with the previous overpayment that he received in 2008. In addition, while

Plaintiff also provided pay stubs during and after 2014, the pay stubs were for periods when his entitlement to DIB had already ended, namely, for the period July 31, 2013 through September 9, 2014 and for the period August 26, 2015 through November 17, 2015.

Based on the foregoing, the ALJ's finding that Plaintiff was at fault is supported by substantial evidence. As such, "there is no need to consider the second requirement for obtaining a waiver: whether recoupment would defeat the purpose of Title II (that is, whether it would deprive the claimant of the income needed for ordinary and necessary living expenses) or would run counter to equity and good conscience (because the claimant had changed his position for the worse in reliance)." *Martinez*, 2011 WL 679851 at *5.

## III.   Conclusion

The Court does not make independent factual determinations, re-weigh the evidence, or substitute its decision for that of the ALJ. Thus, the question is not whether the Court would have arrived at the same decision on *de novo* review; rather, the Court's review is limited to determining whether the ALJ's findings are based on correct legal standards and supported by substantial evidence. Based on this standard of review, the Court concludes that the ALJ's decision is due to be affirmed.

Accordingly, it is **ORDERED**:

1.    The Commissioner's decision is **AFFIRMED**.

2.      The Clerk of Court shall enter judgment accordingly, terminate

any pending motions, and close the file.

**DONE AND ORDERED** at Jacksonville, Florida, on March 16, 2021.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record